### NEAL *v.* NEAL.

1. BILLS AND NOTES — TRIAL — WITNESSES—CROSS-EXAMINATION— FRAUD.

Cross-examination of plaintiff's husband, who claimed to have obtained the note upon which action was brought for a loan of $300 and for an existing indebtedness, was improperly restricted by the trial court, who refused to permit counsel for the defendant to ask him where he got the $300 in support of the defense that the note was forged and the claim fraudulent.

2. SAME.

Where the defense of fraud is set up, a wide latitude should be allowed upon the cross-examination of a witness who participated in the transaction.

3. SAME—DEFENSES—CROSS-EXAMINATION.

Defendant claimed, in an action upon a promissory note, that he had not executed the instrument which was written in his wife's handwriting upon one of the forms taken from the book of the defendant. His wife testified that the payee came to her and asked her to draw up two $500

notes for the use of his son who owed him $1,000; that she prepared the notes in blank, taking a form from her husband's book of blank forms, and gave them to the payee. Defendant's counsel asked the payee, who was a witness, whether he had not subsequently attempted to trade a note of his son for an automobile, and the witness denied doing so. Thereupon the attorney offered to show that the witness did have a note of his son at the time inquired about, and offered to trade it for the automobile. The court excluded the testimony. *Held*, that the testimony was admissible as bearing upon the probability of the testimony of the wife of defendant, that the notes were prepared for the son and not for her husband to sign.

4. SAME—IMPEACHMENT.

Such testimony was also competent to impeach the testimony of the payee who had denied having notes of his son, or that there was any such indebtedness.

5. WITNESSES—IMPEACHMENT—REPUTATION.

Also it was erroneous to strike out testimony of impeaching witnesses who stated that they knew plaintiff's principal witness, had known him for a number of years and named persons who had questioned the veracity of the witness for plaintiff: one of the impeaching witnesses stating that he had lived in an adjoining township from him, that he had heard numerous persons who lived near the witness talk about his truthfulness, and the testimony being struck out because the witness could not name any prsons whom he had heard make statements concerning the matter.

6. APPEAL AND ERROR—TRIAL—CONDUCT OF COURT.

Unless the claim that the trial court made prejudicial remarks has been brought to the notice of such court, it will not be considered on error.

7. JURY—QUALIFICATIONS.

A juror will not be held disqualified because he is an alien, if the record permits an inference that he might be a qualified elector. Also, the objection is not well taken, after judgment in a civil action.

8. BILLS AND NOTES—WEIGHT OF EVIDENCE.

*Held*, that the verdict was not manifestly against the weight of the evidence.

Error to Shiawassee; Miner, J. Submitted April 21, 1914. (Docket No. 92.) Decided June 1, 1914.

Assumpsit by Olive M. Neal against John G. Neal upon a promissory note. Judgment for plaintiff. Defendant brings error. Reversed.

*Leon F. Miner* (*Louis E. Howlett* and *Byron P. Hicks,* of counsel), for appellant.

*W. P. Van Winkle* and *Chapman, McNamara & Matthews,* for appellee.

STONE, J. This action was brought to recover on a promissory note, reading as follows:

"$500.00.                    June 20, 1911.

"Six months after date I promise to pay to the order of James W. Neal, or bearer, the sum of five hundred dollars ($500) at ——, for value received, with interest at six per cent. per annum.

"JOHN G. NEAL."

John G. Neal, the maker of the note, and James W. Neal, the payee of the note, are brothers. Olive M. Neal, the plaintiff, is the wife of James W., the payee. There is no claim in the case that the plaintiff is a *bona fide* holder; the note having been transferred to her in the fall of 1912, after it became due.

The defendant claimed upon the trial that he never signed or delivered the note in question, and, further, he claimed there was no consideration for it. He, by affidavit, in due form, denied the execution of the note. The record discloses that at the time this note bears date James W. Neal was not living with his wife. He was living in the home of the defendant, who was a farmer in Shiawassee county. He had made his home with the defendant and worked for him on his farm from October, 1910, until September 20, 1911. The note was written upon a blank promissory note, and the written portion thereof, except the

signature, is, by the uncontradicted evidence, in the handwriting of Anna Belle Neal, the wife of the defendant. The genuineness of the signature was a disputed question, also whether there was any consideration for the note.

James W. Neal, the payee, was the only witness who gave direct testimony as to the signing of the note. He testified on direct examination as follows:

"I saw the signature at the bottom of the note, Exhibit A, written. John Neal wrote it. At the time that was done I stood by the heating stove in the sitting room, and he sat to a little desk just to the left of the heating stove in his house on the farm in the township of Antrim on the 20th day of June, 1911. When John had signed his name to the note he handed it to me. I put it in my pocket and went to Byron. I couldn't say whether there was or wasn't any one else present in the room at the time it was signed by John, except him and I. John's wife was in the house at that time. John Neal took that blank form upon which that note is written out of his note book. It is a blank note filled out. The balance of the note, except the signature, I saw written by Mrs. Belle Neal, John's wife. She wrote it the morning of the 20th, not but a few minutes before John signed it. She just handed it to me and asked me if it was all right, and he came in and looked it over and sat down and signed it. The pen and ink with which he signed the note sat on the stand. They furnished it. From that time until the 20th of September I continued to work for John and continued to retain this note. At the time John signed this note and gave it to me he was owing me the amount stated in the note. I had let him have money several times before that day. I had his notes before that. I had them at the time. Had them at the time for different things; for money and horse and buggy I sold him. I held a note for a horse and buggy. The amount of that note was $200. * * * That $200 note didn't go into this $500. That was another transaction.

"*Q.* What other notes did you hold against him at that time that he gave you this $500 note?

"*A.* Well I let him have—I am not positive of that

amount. It was either $200 or $250 in October, 1910, soon after I went there. Then later on—I did not surrender that note. I was holding that note at that time. That didn't go into the consideration. I held another one of two hundred. That went into this five hundred consideration. I am not sure I surrendered it that day; but I gave him a note that went into this $500. The other amount that went into this $500 was money that I had let him have at that time.

"Q. Then how much money did you let him have on the day he gave you this note?

"A. $300. I don't say it was that day. I think I let him have the money previous to the 20th, a few days that he had got this money. Part of it I think he got that day."

On cross-examination this witness was interrogated on the subject of where he got the money which he claimed he had loaned to his brother. The following occurred:

"Q. From whom did you get it?

"Plaintiff's counsel: I object to it as immaterial.

"A. I absolutely refuse to answer.

"The Court: I will sustain the objection. (Exception for defendant.)

"Defendant's counsel (continuing): We have a right to call that person in here to know whether he is telling the truth or not, to know who the person is.

"The Court: I sustained the objection. Proceed. (Exception for defendant.)  *  *  *

"Q. Witness, in order that I may understand you, did you or did you not say that you received this money from Mrs. Ketchum previous to the day when you let John have this $300 that you have testified to?

"Plaintiff's counsel: I object to that as incompetent.

"The Court: Objection sustained. The record will show what he said. (Exception for defendant.)  *  *  *

"A. I held four notes against Mr. John Neal, but not at this time. I had three in my possession at this time, I think, unless one of them was paid. One of them might have been paid, and I had two of them at that time before he gave the $500 note. I don't

know positively how many I did have at that time. I couldn't tell when a single one of these notes was paid exactly.

"*Q.* Can you tell and be sure of it within three months?

"*A.* I think I can.

"*Q.* Which one?

"*Plaintiff's counsel:* I object to this as immaterial, as to whether he knows when they were paid. They can't test his memory upon something that is immaterial.

"*The Court:* I will sustain the objection. (Exception for defendant.)

"*Defendant's counsel:* They brought this question of these notes in here.

"*The Court:* Does that make any difference?

"*Defendant's counsel:* Because they brought it in they can't say it is immaterial when I cross-examine upon the same matter.

"*The Court:* Yes; they can. Because they brought it in does not make it material. The rule of evidence is whether a thing is material. (Exception for defendant.)

"*Defendant's counsel:* Having opened the door, can they close it themselves?

"*The Court:* No; the court closes it on the ground it is immaterial. (Exception for defendant.)"

Further in the cross-examination this witness had testified to a conversation with his brother-in-law, Walter S. Stuible, in which he denied having asked Stuible whether he thought the signature of the note was defendant's, and stated that he perhaps told him, when he showed him this note, that he did not want him to tell that he had those notes against John. The following question was asked by defendant's counsel:

"*Q.* The fact that you had a judgment against you unsatisfied didn't have anything to do with your wanting to keep that note a secret, did it? (Objected to by plaintiff's counsel as incompetent, immaterial, and irrelevant, and assuming facts not proven.)

"*The Court:* I will sustain the objection. (Exception for defendant.)

"*Q.* Is it or is it not a fact that at that very time you had a judgment against you which was unsatisfied in the circuit court for the county of Livingston?

"*Plaintiff's counsel:* I object to it as incompetent, immaterial, and irrelevant. (Objection sustained by the court, and exception for defendant.) * * *

"*Q.* Do you or do you not admit that you told him [Stuible] not to say anything about this $500 note?

"*Plaintiff's counsel:* I object to it as immaterial.

"*The Court:* Objection sustained. (Exception for defendant.) * * *

"*Q.* Did you ever tell any one else besides Walter Stuible that you had this note for $500 previous to the time you started the suit?

"*Plaintiff's counsel:* I object to it as immaterial.

"*The Court:* Objection sustained. (Exception for defendant.)"

James W. Neal had testified on direct examination that at a subsequent time he and his brother John had some trouble, and that at John's house the witness had said to John, in the presence of the latter's wife:

"All I ask of you is to pay me that note and what you owe me, and I will never darken your doors."

Anna Belle Neal, defendant's wife, was called upon the defense, and she was asked this question with reference to that conversation:

"*Q.* Was anything said at that time about any note?

"*A.* Not a word.

"*Plaintiff's counsel:* I object to that and ask to have it stricken out as leading.

"*The Court:* Yes.

"*Defendant's counsel:* It is a denial of what has been testified to by him [James].

"*The Court:* It may be stricken out for the present. (Exception for defendant.)

The testimony of James W. Neal as to the making of the note was contradicted by the defendant, his wife, and his son. Anna Belle Neal testified on direct examination with reference to the note as follows:

"I have seen that paper before. The handwriting of the written portion looks like mine. I remember writing it. The written portion except the signature. Mr. James Neal asked me if I would draw up two $500 notes for his boy. He said he wanted two $500 notes drawn up for his boy, Thane, blank, just the body drawn up for his boy ready for him to sign. I told him I would, and he says, 'John has got a bank note book, hasn't he?' I says, 'Yes.' He said, 'He wouldn't care if you took them out of there, would he?' I said I didn't think he would. So I went and got the book and drawed up two $500 notes for him, just the body of the notes.

"*Q.* What, if anything, did he say to you about his son, Thane, owing him at that time?

"*A.* He said he owed him $1,000; he had $1,000 note against his boy. He said his boy promised him he would make the $1,000 note good, and he wanted the $1,000 note split in two so it would make them smaller. I never drew up any other $500 note or notes and gave it to anybody payable to James Neal, or bearer. Exhibit A looks like the note that I drew up. It was about that time. At the time I drew up this note, Exhibit A, and the other like it, my husband was on the farm some place, I think. He was not at the house or in the room. Mr. James Neal and my boy and I was in the room at the time I wrote up these two $500 notes. My boy is 14 years old. I never drew up a $500 note in the presence of myself, my husband, and my boy, and James Neal, and my husband sign it there in our presence. I never knew of my husband signing and never saw him sign a $500 note payable to the order of James Neal, or bearer. I do not know who wrote the signature on Exhibit A. I never saw this note with the signature on until you showed it to me Saturday. At the time I gave it to James there was no signature on it."

On rebuttal plaintiff called as a witness Thane Neal and asked him the following question:

"*Q.* Mr. Neal, there has been some testimony offered that at the time of the drawing up of this paper that your father said that you were owing him $1,000, and he wanted two $500 notes. You may state

as a matter of fact whether, on June 20, 1911, you were owing your father anything?"

"*A.* I was not."

In the cross-examination of James Neal he had been asked by defendant's counsel whether he did not try to trade Thane Neal's note to one Otto Steinacker for an automobile, and he denied in the following language:

"I did not try to trade this note against Thane to Mr. Steinacker for an automobile. I did not show it to Mr. Steinacker and ask him if he would take that note in payment or exchange for an automobile. I didn't show this note to John and his wife as late as the month of June, 1911."

Defendant's counsel offered to show that James Neal did have the note in June, 1911, against his son Thane and offered to trade it to Steinacker for an automobile. Otto Steinacker was called as a witness, and he was interrogated upon that subject. This testimony was objected to by plaintiff's counsel as incompetent and immaterial, and the objection was sustained by the court. The further question was asked by defendant's counsel:

"You may state whether or not James Neal at that time showed you any note?

"*Plaintiff's counsel:* I object to it as incompetent, immaterial, and irrelevant.

"*The Court:* The objection will be sustained. (Exception for defendant.)"

Defendant's counsel also sought to show by defendant that in the month of June, 1911, he saw this $1,000 note of Thane Neal's in the possession of James W. Neal at defendant's house. This evidence was objected to on the ground that the same was immaterial, and irrelevant, and collateral, and the objection was sustained, to which ruling defendant's counsel excepted.

Upon the trial defendant's counsel sought to impeach the general reputation of James W. Neal for truth and veracity. One John Frye was called as a witness for that purpose. He was asked the general questions:

"Do you know what the reputation, the general reputation, of James Neal is in the vicinity for truth and veracity? Do you know what it is? Yes or no to that question.

"A. Well, I know so much what I heard from other folks of course.

"Q. Was it good or bad?

"A. Well, according to how you look at it.

"Q. Which is it?

"A. Well, I guess it was bad enough."

On cross-examination he testified that he had heard Mr. Hal Lewis say that his reputation for truth and veracity was bad, and that Mr. Lewis had been dead about four years.

"*Plaintiff's counsel:* More than that, ain't it? Ain't it nearly twelve years that Mr. Lewis died? What?

"A. Mr. Lewis died, I guess, about four or five years ago.

"*Plaintiff's counsel:* I move to strike that statement out, what he heard a dead man say who has been dead five years.

"*Defendant's counsel:* I object to it.

"*The Court:* It may be stricken out. (Exception for defendant.)"

James Atherton was also called as an impeaching witness and testified that the general reputation of James W. Neal was bad. On cross-examination he was interrogated as to whom he had heard speak of his reputation:

"A. Claud Badgero down to Byron, another man down there; I can't remember his name.

"Q. Claud Bradley?

"A. Badgero, yes; and many others I don't just call to mind just now.

"*Plaintiff's counsel:* I move to strike out 'many others I don't just call to mind.'

"*The Court:* Yes; it may stricken out. (Exception for defendant.)"

John Allen was also called as a witness on behalf of the defendant and testified as to the general reputation of James W. Neal. We quote this testimony for the reason that the court struck it out entirely. The witness testified as follows:

"I live in the township of Burns and have lived there for eighteen years. I know James Neal.

"*Q.* Do you know what his general reputation is for truth and veracity in that community?

"*A.* Yes, sir.

"*Q.* What is it, good or bad?

"*A.* I should call it bad."

Cross-examination:

"I lived about five miles and a half or such a matter from James, where he lived when he was on the farm. There are near neighbors to him down there. Country is quite thickly populated. I can't call to mind whom I have heard say James' reputation for truth and veracity was bad; but I heard it spoken.

"*Q.* Reflect back in your mind, haven't you too got James' reputation for chastity mixed with his reputation for veracity?

"*A.* I don't think I have."

Redirect examination:

"*Q.* You may state whether or not you have heard many or few persons in the vicinity in which he resides discuss this question as to his reputation?

"*A.* I heard quite a few."

Recross-examination:

"*Q.* Can you give the name of any man in the village of Byron or in the township that you have heard say it?

"*A.* I can't.

"*Q.* Can't you tell one of them? There are a good many people in the township of Burns. About what is the population in that township?

"*Counsel for plaintiff then said:* Your honor, in view of the statement made on cross-examination of this witness that he couldn't say he heard any of the people that lived in that neighborhood or vicinity say any of these things, I move to strike out, and I base it on the case of *Elijah Calkins* v. *Ann Arbor Railroad.* Such testimony as that is incompetent.

"*Defendant's counsel:* I object to its being stricken out.

"*The Court:* Let me ask a question or two.

"*By the Court:* Q. Where does Mr. Neal live now?

"*A.* He lives in Owosso.

"*Q.* How long since he lived—did he ever live in the township of Burns outside of the village of Byron?

"*A.* Yes—Oh yes, sir; he has.

"*Q.* How many years ago?

"*A.* I should think about—

"*The Court:* I withdraw that question. Where has he lived in the last five years?

"*A.* In the last five years?

"*Q.* Yes.

"*A.* Why, he has been all over, I guess, most of the time. Traveling some.

"*Q.* Do you know where he has lived in the last five years any of the time?

"*A.* He has lived on the farm within the five years.

"*Q.* Is that farm in the township of Burns?

"*A.* No, sir; it is in Livingston county.

"*Q.* Livingston county? Have you ever heard any one talk about him in that neighborhood about his reputation for truth and veracity, in the neighborhood where he resided when he lived in Livingston county?

"*A.* Why, I think so; but I couldn't tell any names.

"*Q.* Can you tell when it was?

"*A.* Well, no; I can't.

"*Q.* Can you tell where they resided?

"*A.* No, sir.

"*Q.* Now did he live in the township of Byron some to your knowledge?

"*A.* No, sir; he did not.

"*The Court:* I think it may stricken out. (Exception for defendant.)"

Redirect examination:

"*Q.* How far from the Burns township line did he live when he lived on this farm in Livingston county?

"*A.* He lived just across the road from the Burns township line.

"*Q.* You have lived in the township of Burns during all that time?

"*A.* Yes, sir.

"*Q.* Have you heard people who live on the Burns township side of the road, and who live near him, talk about his reputation for truth and veracity?

"*A.* Yes, sir.

"*Defendant's counsel:* I now move to reinstate the testimony that has been stricken out."

By the court:

"*Q.* Who was it, when was it?

"*A.* You can hear it most any time.

"*Q.* No; when was this particular conversation?

"*A.* It is the general impression.

"*Q.* When was the conversation given, give the time?

"*A.* I can't state.

"*Q.* Do you remember of hearing any one talk about it in the last year in that vicinity?

"*A.* I don't remember.

"*Q.* Do you remember of it? If so, who was it?

"*A.* I can't speak any names; but I am positive I heard it.

"*The Court:* I will explain to them so they will understand possibly. General reputation is what people generally say about them, not what one or two persons say, but what people in the vicinity where the parties reside generally say of them. 'Generally' means more than one or two. Proceed.

"*Defendant's counsel:* Did the court rule on my motion to reinstate?

"*The Court:* No; I will deny the motion. (Exception for defendant.)"

The trial having resulted in a verdict and judgment for the plaintiff for the full amount of the note sued upon, the defendant entered a motion for a new

trial, assigning many grounds therefor, among others the following:

(1) That Christopher Gute, one of the jurors who sat during the trial of said cause, was not a legally qualified juror, because he was not a citizen of the United States, nor a citizen of the State of Michigan, which facts were unknown to defendant or to his counsel.

(2) Because the verdict of the jury therein is against the weight of the evidence.

The affidavit in support of the motion, in so far as the juror was concerned, was to the effect that Christopher Gute, one of the jurors who sat in said cause, was not a citizen of the United States of America, nor a citizen of this State, and that this fact was unknown to defendant until after the verdict was rendered.

The motion for a new trial was denied, and with reference to the second ground the circuit judge said:

"It did occur to the court that the weight of the evidence was with the defendant, or, in other words, that the plaintiff had not shown by a preponderance of the evidence that plaintiff was entitled to recover; but the witnesses were all in court and appeared upon the witness stand, and the jury listened to their testimony, and the court does not feel that the jury acted fraudulently in their decision, and, from the fact that it is the duty of the jury to pass upon questions of fact, the court does not feel that he is authorized to set aside the verdict upon that ground."

The motion for a new trial was overruled, to which ruling defendant's counsel duly excepted.

The defendant has brought the case here for review, and there are more than 50 assignments of error. We have examined the record carefully and must say that many of the assignments of error are without foundation, and some parts of the argument of counsel for appellant are not based upon any assignments of error. It is the claim of defendant:

(1) That there were errors in the rulings of the court during the trial in receiving and rejecting testimony.

(2) Errors consisting of prejudicial remarks made by the court during the trial.

(3) Error in refusing to grant a new trial.

The questions which we shall discuss are covered by assignments of error.

1. It is the claim of counsel for defendant and appellant that the case was tried in the court below upon the theory by defendant that a fraud was being perpetrated upon him, and that in such a case the law permits a wide latitude in the range of testimony, especially in the cross-examination of witnesses; that the trial court adopted too strict a rule in the cross-examination of the payee of the note, James W. Neal. It is urged that it was material to show that James W. Neal had no money to loan at the time he claimed the note sued upon was made. In view of the direct conflict in the evidence, and the fact that fraud was claimed by the defendant, we are of opinion that the court should have given a wider range to the examination of witnesses than was here given.

This court has said that, where there is a defense of fraud set up, a wide latitude should be allowed upon the cross-examination of a witness who was a participant in the transaction. *Anderson* v. *Walter,* 34 Mich. 113; *Jacobson* v. *Metzger,* 35 Mich. 103; *Gutsch* v. *Pittsley,* 51 Mich. 566 (17 N. W. 59); *Fury* v. *Strohecker,* 44 Mich. 337 (6 N. W. 834); *Wessels* v. *Beeman,* 87 Mich. 481 (49 N. W. 483).

We are of opinion that it was material and competent for the defendant to show that James W. Neal offered to trade his son's note of $1,000 to Mr. Steinacker in the month of June, 1911, and that he had such note in his possession, as bearing upon the probability of the truthfulness of the testimony of the wife of the defendant above referred to. *Banghart* v.

*Hyde,* 94 Mich. 49 (53 N. W. 915); *Fountain* v. *Hutchinson,* 108 Mich. 596 (66 N. W. 477); *Raymond* v. *Day,* 111 Mich. 443 (69 N. W. 832); *Aldrich* v. *Scribner,* 146 Mich. 609 (109 N. W. 1121).

The case was a close one upon the facts, and we think that it was prejudicial error to exclude the testimony offered.

Such offered testimony was also material as tending to contradict the testimony of James W. Neal, and was not collateral.

We are of opinion that it was prejudicial error for the trial court to strike out the testimony of the witness John Allen, and to rule as it did upon the testimony of James Atherton and John Frye. This testimony was material and competent, and its weight was for the jury. Had Allen's testimony been admitted, it might have led to a different result. *Keator* v. *People,* 32 Mich. 484; *People* v. *Mix,* 149 Mich. 260 (112 N. W. 907, 12 Am. & Eng. Ann. Cas. 393).

2. There is no merit in the claim that the court erred by making prejudicial remarks during the trial. The attention of the court was not called to the matter of such claim, and the question is not properly before us. Without reference to what the rule of the circuit may be relating to exceptions to rulings, we will not consider the question where the attention of the trial court was not challenged upon the subject.

3. Error in refusing to grant a new trial.

(*a*) The claim is made that the juror Gute was not legally qualified. There is nothing in the record to show that fact. For aught that appears, this man may have declared his intention to become a citizen 2 years and 6 months before November 8, 1894, in which case he would be an elector and qualified as a juror. *People* v. *Collins,* 166 Mich. 4-9 (131 N. W. 78, Ann. Cas. 1912D, 981). It will be presumed that the juror was qualified to act as such, in the absence

of proof to the contrary. It may also be said that the point is not a good one in a civil case, where the fact was not discovered until after judgment. *Johr* v. *People*, 26 Mich. 427; *People* v. *Scott*, 56 Mich. 154 (22 N. W. 274).

(*b*) That the verdict was against the weight of the evidence. While we cannot say that the verdict was plainly and manifestly against the weight of the evidence, it does appear that the case was a close one, and justifies us in a careful examination of the rulings of the trial court in the admission of evidence.

For the errors pointed out relating to the rulings of the trial court in admitting and rejecting testimony, we are constrained to reverse the judgment of the court below, and grant a new trial.

McALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.