## HOUSEMAN *v.* WALT NEAL, INC.

.AUTOMOBILES—GUEST PASSENGERS—EQUALLY DIVIDED COURT—EVI-
DENCE AS TO DRIVER'S REPUTATION FOR TRUTH AND VERACITY—REF-
ERENCE TO INSURANCE.

Judgment for plaintiff, guest passenger, against defendant driver
and defendant owner for injuries received when car was
wrecked while negotiating a curve is affirmed, the Supreme
Court being equally divided as to whether reversible error had
been committed by trial court's exclusion of testimony in regard
to defendant driver's reputation for truth and veracity and
by reference of plaintiff's counsel to "defense insurance com-
pany" (CLS 1956, §§ 257.401, 500.3030).

REFERENCES FOR POINTS IN HEADNOTE

5 Am Jur 2d, Appeal and Error § 902.

Appeal from Ingham; Hughes (Sam Street), J. Submitted October 4, 1962. (Docket No. 25, Calendar No. 49,472.) Decided December 31, 1962. Rehearing denied May 9, 1963.

Case by Ollie Houseman against Walt Neal, Inc., a Michigan corporation, and Harvey Schultz for personal injuries sustained when automobile in which he was a guest passenger was wrecked on July 26, 1958. Verdict and judgment for plaintiff. Defendant Walt Neal, Inc., appeals. Affirmed by an equally divided court.

*Glassen, Parr, Rhead & McLean* (*Warner, Hart & Warner,* of counsel), for plaintiff.

*Marshall, O'Brien & Fischer* (*John P. O'Brien,* of counsel), for defendant Walt Neal, Inc.

SOURIS, J. (*for affirmance*). Plaintiff had judgment on a jury's verdict for $23,500 in this guest-passenger case against his host automobile driver and its owner, from which Walt Neal, Inc., defendant owner of the car, alone appeals. The principal ground for reversal urged upon us is that the evidence presented was not adequate to support the jury's finding that defendant Schultz, the driver, was guilty of "gross negligence or wilful and wanton misconduct" within the meaning of our guest-passenger act, CLS 1956, § 257.401 (Stat Ann 1960 Rev § 9.2101). We review the trial judge's denial of appellant's motions for directed verdict and for judgment *non obstante veredicto* and new trial by examining the evidence in the light most favorable to plaintiff's claim. There was conflicting evidence of speed, of intoxication, of a disregarded warning from plaintiff passenger, and of the driver's response to such warning, from all of which we conclude that a jury properly could find, as this jury did, that plaintiff's

injuries were proximately caused by the driver's "gross negligence or wilful and wanton misconduct" as that term has been construed by this Court, most recently in *Turner* v. *Cotham*, 361 Mich 198, 207.

This case perhaps approaches the "boundary between jury verdict and commanded verdict" but, after careful study of this testimonial and photographic record, we are convinced it remains a "doubtful case" properly submitted for jury determination.[1]

Plaintiff's stake truck had run out of gasoline while he was driving it several miles from his home. Shortly thereafter he was given a ride by someone from the place where his truck stopped to the road on which his home was located. While walking along the road to his home, he encountered defendant Schultz, a neighbor, who offered to drive plaintiff to plaintiff's home for gasoline and then back to the truck. Plaintiff accepted Schultz's offer although he detected the odor of some sort of alcohol on defendant's breath. They drove about 1/2 mile northward up the road to plaintiff's house, where he procured a can of gasoline, then returned to Schultz's house, where Schultz stopped to pick up a Mr. Miller, an elderly companion who had stayed with him the previous night, and then resumed the journey to the truck. Not far from the Schultz house, Schultz turned west and drove 1/2 to 3/4 of a mile along a paved 2-lane highway to a gravel road. Plaintiff's truck was about 2 miles south on that gravel road, but Schultz lost control of the car while negotiating a curve about 8/10 of a mile south of the paved highway and plaintiff suffered the injuries for which he sued.

Plaintiff testified that Schultz drove in a normal, proper manner to plaintiff's house and around his circular drive, back to Schultz's house for Mr. Miller,

---

[1] *Tien* v. *Barkel*, 351 Mich 276, 283.

along the paved highway to the gravel road and along the gravel road up to a point a short distance from the place of the accident. Plaintiff testified that Schultz traveled no faster than 25 or 30 miles per hour up to this point in the journey, the legal speed limit being 65. Then, plaintiff tells us he became aware of a milk truck pulling up alongside the Schultz car in the act of passing and he called Schultz's attention to this fact. His pertinent direct testimony follows:

"*Q.* Did you make any statement at all at that time to Mr. Schultz?

"*A.* Yes. I asked him to let the truck go by us.

"*Q.* Do you remember the words you said?

"*A.* Yes, I said, 'Let him go, Harvey; let him go.'

"*Q.* What did Mr. Schultz say to you?

"*A.* Well, he said, 'What's the matter? You scared? I am not going to eat his dust.'

"*Q.* Did you make any reply?

"*A.* Yes, I told him, 'Hell, yes.'

"*Q.* What happened to the truck? Did the truck go by?

"*A.* No, the truck fell in behind us.

"*Q.* What is the next thing you remember?

"*A.* The next thing I remember was just the crash.

"*Q.* Do you remember whether the car skidded at all before the crash?

"*A.* Yes, I remember it kind of went out of control. The car fishtailed in the road or swerved.

"*Q.* The rear end moved back and forth?

"*A.* Yes, the rear.

"*Q.* How far would you say it fishtailed before it left the road?

"*A.* Oh, I don't have any idea. It wasn't very long. We only went probably back and forth 2 or possibly 3 times.

"*Q.* Back and forth 2 or 3 times like that?

"*A.* Yes.

"*Q.* And he was still going about the same speed?

"*A.* Well, I think he was trying to brake the car. I wouldn't know.

"*Q.* You don't know whether he put on his brakes or not?

"*A.* I assume he was.

"*Q.* But it is your opinion you saw the speedometer at about 60?

"*A.* Yes.

"*Q.* Aside from the speedometer reading, you have ridden in cars quite a lot, haven't you?

"*A.* Yes.

"*Q.* You are familiar with side roads like Springport?

"*A.* Yes.

"*Q.* Did you form any opinion, regardless of the speedometer, as to what speed you were driving?

"*A.* No, all I know is we were going pretty fast.

"*Q.* Did there come a time the car went out of control?

"*A.* Yes.

"*Q.* Was there a slight bend in the road there?

"*A.* Yes, there is.

"*Q.* Is it a sharp bend or a gradual bend?

"*A.* It is a gradual bend.

"*Q.* Do you recall if there was any dust at that time?

"*A.* Yes, there was dust. There had to be. The road is very loose, a graveled road, and just the dust from the vehicles.

"*Q.* It was dry at that time of the year?

"*A.* Yes.

"*Q.* Do you know which side of the road you went off?

"*A.* Yes, we went off on the right-hand side of the road.

"*Q.* Do you know what you hit?

"*A.* A stump.

"*Q.* You learned that later?

"*A.* Yes."

On cross-examination, plaintiff testified as follows:

"*Q.* Was a speed of 45 miles per hour too fast, in your opinion, on that road?

"*A.* No, I don't believe it was.

"*Q.* Was a speed of 50 miles per hour too fast, in your opinion?

"*A.* No.

"*Q.* How fast did you go down the road when you drove down a previous date?

"*A.* 45 to 50.

"*Q.* Now, you have heard Mr. Starkweather [driver of the milk truck] testify here that when he dropped behind he was going about 45 miles an hour?

"*A.* Yes.

"*Q.* Is that right? Did you hear that?

"*A.* I heard it.

"*Q.* Now you say in this courtroom you saw the speedometer on Mr. Schultz's car when he was going 60 miles an hour at that point?

"*A.* I said I thought I did.

"*Q.* Well, did you or didn't you? Did you see the speedometer on your car show 60 miles an hour?

"*A.* I couldn't say definitely whether I did. I said I thought that was the reading that I saw on the speedometer.

"*Q.* In other words, you are not sure of it?

"*A.* No, things were pretty excited or I was pretty excited.

"*Q.* Mr. Starkweather said it was about 45. Would you say that was about the speed?

"*Mr. Glassen:* Counsel is mistaken. He said 45 to 47, and he also said in his opinion the Schultz car was going 5 to 7 miles faster. If you are going to quote what Starkweather said, quote the whole thing, and not take 1 phrase out of context.

"*Mr. O'Brien:* I think counsel is right on 1 point.

"*Q.* When you dropped behind, he said he was going between 45 and 47, and you said he was going

60 miles an hour because you saw the speedometer, is that right?

"*A.* I said I thought that was what I saw; as I remember it now, that is the reading I saw on the speedometer.

"*Q.* At this point, is that right?

"*A.* That's right."

As indicated in the portion of plaintiff's cross-examination just quoted, there was testimony from the milk truck driver, Mr. Starkweather, that Schultz was not traveling quite as fast as plaintiff believed and there was also testimony controverting other portions of plaintiff's testimony. However, for our appellate purpose, we must regard the evidence in the light most favorable to plaintiff and so accept his version of the events which preceded and caused his injuries. Resolution of conflicting evidence is the jury's task, but the trial judge's, and ours, is to determine whether plaintiff's case legally merits submission to the jury.

Plaintiff and Starkweather both testified they smelled alcohol on Schultz's breath. Plaintiff, although he smelled alcohol on Schultz when he first got into the car, did not then believe Schultz was intóxicated. According to plaintiff, Schultz acted, walked and talked normally except for the fact that he drove exceedingly slowly up until the milk truck attempted to pass and then exceedingly fast until he left the road. Starkweather's testimony was that Schultz's breath at the scene of the accident smelled of intoxicating liquor and that he acted and talked in a manner from which the jury could have found that he was drunk.

Although the curve where the accident occurred was described as a gradual curve, photographs introduced in evidence disclose it to be a rather sharp, unbanked curve certainly not far removed from a 90° turn in this loose gravel road. Schultz (who was

familiar with the road and its condition) and others testified that the road, and particularly the curve, was always bumpy. The curve was described by Starkweather as "quite flat and washboardy a little bit." There was testimony from 1 witness that the curve could be negotiated at 60 or 65 miles per hours, incredible as that may seem to one viewing the photographs, but the fact remains that Schultz failed to make it whether he was traveling at 60 miles per hour, as plaintiff claims, or at 40 miles per hour, as Schultz himself claims.

One other pertinent fact should be mentioned. Defendant Schultz, during the afternoon preceding the accident, had obtained the car, a 1950 Plymouth, from the used car lot of defendant Walt Neal, Inc., an automobile dealer. He had paid $11 on its $100 purchase price, but the sale transaction had not been completed.

From the foregoing evidence, the jury was entitled to find that Schultz, while under the influence of intoxicating liquor and displaying anger at plaintiff's suggestion that he allow Starkweather to pass, accelerated the 8-year-old car, the operating characteristics of which he could not yet know, to an excessive speed for the bumpy, loose gravel roadway and its impending curve, the condition of which he did know, in wilful and wanton disregard of the probable consequences. Such findings, justified by the evidence presented, would support a jury's conclusion of gross negligence or wilful and wanton misconduct within our holding in *Turner* v. *Cotham, supra,* and the rule of the cases therein cited. See, also, *McLone* v. *Bean,* 263 Mich 113, 115, cited in *Tien* v. *Barkel, supra,* and 69 LRA 516 and 20 RCL Negligence, § 118, p 145.[2] We find no error in the submission of this issue to the jury.

---

[2] 38 Am Jur, Negligence, § 178, p 855.

A substantial part of the proofs offered below related to the circumstances surrounding defendant Schultz's negotiations for the purchase of the car from appellant and his driving it away from appellant's used car lot the day before the accident. Plaintiff's declaration alleged Schultz took the car with appellant's consent or permission and in his charge to the jury the trial judge instructed that appellant's consent or permission could be express or implied. We find no error in the trial judge's charge which was based upon the language of CLS 1956, § 257.401 (Stat Ann 1960 Rev § 9.2101), and properly reflected plaintiff's theory of the case as pleaded and tried.

Appellant also claims error in exclusion of testimony from a justice of the peace and a police officer as to Schultz's reputation for truth and veracity. A separate record of the excluded testimony was made in the absence of the jury. Schultz's reputation for truth and veracity was of some importance only to the question whether he had taken the car with appellant's express consent or knowledge. Even if we assume, without deciding, that the proffered testimony should have been admitted, we are not persuaded by appellant's argument that it was reversible error to exclude such testimony.

There was ample evidence not dependent upon the credibility of Schultz's testimony alone from which the jury could have found the car was taken with appellant's consent or knowledge, express or implied, as to which the excluded testimony would have no bearing whatever. When Schultz asked for dealer license plates to put on the car so that he could drive it home with him, appellant's salesman told him there were no dealer plates available. The salesman, confirming Schultz's testimony, testified that Schultz told him that he, Schultz, would seek permission of the local police chief to drive the car to his home without license plates. It is undisputed that Schultz

did ask the police chief for such permission and, upon its refusal, he returned to the lot and drove the car away without further conversation with any of appellant's employees, the key to the car having been given to Schultz earlier to start the engine and having thereafter been left in the ignition. We think these facts sufficient to warrant a finding that the car was taken from appellant's lot with its express or implied consent or knowledge, appellant's agent at no time having told Schultz he could not take the car without license plates or the police chief's permission. The point we make is that the jury was entitled to conclude from the testimony of appellant's own witnesses that appellant had no objection to the removal of the car by Schultz even without license plates and that it was a matter of interest only to Schultz whether or not the police chief granted him permission to do so. Appellant has not convinced us that exclusion of the testimony of Schultz's reputation for truth and veracity, even assuming it should not have been excluded, was prejudicial to it.

Conceding for the sake of argument that appellant proved, with or without the excluded testimony, that it did not expressly consent to Schultz's use of the car, yet it failed to carry its burden of proving by clear, positive, and credible evidence that its implied consent or knowledge was absent. As early as *Hatter* v. *Dodge Brothers,* 202 Mich 97, this Court recognized, in cases such as this, a presumption that the driver's possession and use of another's motor vehicle is lawful. This presumption of innocence[3] has recently been discussed in *Monaghan* v. *Pavsner,* 347 Mich 511, 518.

Although not cited to us on this appeal, both counsel apparently had the *Monaghan Case* in mind dur-

---

[3] CL 1948, § 750.413 (Stat Ann 1954 Rev § 28.645), makes it a felony wilfully to take possession of and drive or take away a motor vehicle belonging to another without authority.

ing the trial. In that case, it will be recalléd, 4 members of this Court said that an owner's attempt to avoid his statutory liability by claiming his motor vehicle was unlawfully taken by the active tortfeasor, must be supported by clear, positive, and credible proof sufficient to rebut the presumption of innocence,—for example, proof that formal criminal complaint was made by the owner against the alleged wrongdoer upon discovery of the alleged unauthorized taking. In the case at bar, appellant's president testified that on the day following the accident, as soon as he heard of it and determined that appellant's car was involved, he verbally reported to the chief of police and the sheriff's department that Schultz was driving appellant's car without authority. However, he made no formal complaint against Schultz, ever, nor did anyone else in behalf of appellant. As a matter of fact, appellant's salesman with whom Schultz negotiated for the car knew on the very day of the accident that Schultz had taken the car and had been in an accident, yet he made no effort to contact the police authorities. His failure to do so then, upon discovery of the claimed unauthorized taking by Schultz, and the failure of appellant's president to make formal complaint thereafter, tend to support rather than rebut the presumption that Schultz had appellant's consent or knowledge, implied if not express, to drive the car off its lot. As was said in *Monaghan* (p 522): "There is no middle ground here. * * * [Schultz's] possession and use was lawful, or unlawful." If unlawful, appellant had a duty to report it promptly upon discovery to the police authorities and to file a formal complaint against Schultz.

Failing this duty, and absent any other clear, positive, and credible proofs rebutting the presumption that Schultz's possession of the car was lawful, the presumption remained available to the jury in sup-

port of a finding, on this record, that Schultz's possession of the car was with appellant's implied consent or knowledge.

Finally, appellant claims the trial judge erred in not granting its motion for mistrial for an event which occurred during the redirect examination of witness Starkweather by plaintiff's counsel:

"*Q.* You never mentioned to me you talked to the defense insurance company before, did you?
"*A.* No, sir.
"*Q.* The defense counsel?
"*A.* No, sir.
"*Q.* Did he tell you he was going to subpoena you?
"*A.* No, sir."

Appellant claims reference to "defense insurance company" by plaintiff's counsel was deliberate and, in any event, prejudicial error requiring a new trial. Plaintiff's counsel denies that he deliberately injected the issue of insurance in the case and says that the phrase "defense insurance company" is a "stupid phrase" negativing any improper motive in its use. He also points out that he immediately corrected his misstatement without emphasizing the objectionable word. During a recess immediately following this incident, appellant moved for mistrial and the trial judge denied its motion. In his charge to the jury, in connection with another reference to insurance by plaintiff (as to which there is no suggestion by appellant of reversible impropriety), the judge instructed the jury that:

"The plaintiff testified that a portion of the hospital bill was paid by some insurance company, in which plaintiff carried a policy. Since plaintiff presumably paid the premium on this policy he is entitled to the proceeds, and if you bring in a verdict for plaintiff, the whole of said hospital bill should be considered by you. As a matter of fact, the question

of insurance of any kind shall not be considered in your deliberations."

We cannot say from what is before us that the regrettable reference to insurance by plaintiff's counsel was deliberately made in bad faith in violation of CLS 1956, § 500.3030 (Stat Ann 1957 Rev § 24-.13030), the provisions of which we have adopted as a rule of procedure by Court Rule No 1, § 3 (1945). The record does not suggest to us that prejudicial error occurred which necessitated a mistrial. The trial judge was in a much better position than are we to determine whether justice to defendants required a new start. The jury was not admonished to disregard the reference to "defense insurance company" when the incident occurred, no request to do so having been made. However, the quoted jury instruction handled the matter as well as could be hoped. We find no reversible error.

Affirmed. Costs to plaintiff.

BLACK, KAVANAGH, and OTIS M. SMITH, JJ., concurred with SOURIS, J.

KELLY, J. (for reversal). Justice SOURIS states that we are confronted with "a boundary between jury verdict and commanded verdict" and a "doubtful case." I agree with that statement.

This is a "doubtful case," a "boundary line" case, as to whether defendant should be held liable for injuries to guest-passenger plaintiff on the grounds that defendant Schultz was guilty of gross negligence and wilful and wanton misconduct. Schultz had come upon plaintiff walking to get gasoline for his stalled truck. He offered plaintiff assistance, which was accepted. Schultz took plaintiff to his home, obtained a can of gasoline, and was returning to the location of the stalled truck when the accident occurred.

, ' This is a "doubtful case," a "boundary line" case, as to whether defendant Neal should be held liable .solely on the grounds that the day before the unfortunate accident, defendant Neal's employee, Mr. Swan, gave defendant Schultz permission to drive a .1950 2-door Plymouth (sale price $100) from defend-ant Neal's used car lot.

This is a "doubtful case," a "boundary line" case, where plaintiff's attorney brought to the attention of .the jury the fact that insurance was involved in the case.

In the past we have commented on the care and caution that we must use in reviewing this type of case, guarding against a miscarriage of justice.

In considering the case where a woman sued her husband's brother on a $500 promissory note,[*] we considered defendant's claim that the court erred in refusing his effort to bring to the jury's attention certain evidence, including impeaching testimony in respect to the husband's reputation, and in reversing the trial court, this Court said (p 130): "The case was a close one, and justifies us in a careful examination of the rulings of the trial court in the admission of evidence," and stated (p 129) that had the "testimony been admitted, it might have led to a different result."

In *People* v. *Mix,* 149 Mich 260 (12 Ann Cas 393), the excluded testimony tending to "prove that Worden had a bad reputation for truth and veracity" was found to be reversible error, and this Court held, ."Worden was not an unimportant witness," and further said (p 264): "We cannot say that the error in excluding this testimony was harmless. Had it been admitted, it may have led the jury to utterly discredit Worden's testimony and to acquit the defendant.

---

[*] *Neal* v. *Neal,* 181 Mich 114.

The ruling was therefore not only erroneous, but it was prejudicial."

Defendant Schultz was "not an unimportant witness." Justice SOURIS's statement, "Schultz's reputation for truth and veracity was of some importance" would, in my opinion, be more accurately stated if the word "some" would be changed to "most" or "all." Without Schultz's testimony the court would not have been justified in submitting plaintiff's case against defendant Neal to the jury.

My Brother does not decide whether the court erred in excluding the testimony as to Schultz's reputation for truth and veracity. In my opinion this exclusion constituted error.

I disagree with his opinion that, "There was ample evidence not dependent upon the credibility of Schultz's testimony alone from which the jury could have found the car was taken with appellant's consent." Justice SOURIS bases such a conclusion upon the fact that when Schultz asked appellant Neal's salesman for plates he was told there were no dealer plates available, and then Schultz said he would seek permission of the local police chief to drive home without plates; that Schultz did ask the police chief and, upon his refusal, Schultz returned to the lot and, without further conversation with any of appellant Neal's employees, drove the car from the lot, and then Justice SOURIS sums up as follows:

"The point we make is that the jury was entitled to conclude from the testimony of appellant's own witnesses that appellant had no objection to the removal of the car by Schultz even without license plates and that it was a matter of interest only to Schultz whether or not the police chief granted him permission to do so."

Appellee's counsel, in his counterstatement of facts, calls to our attention the following question he asked and Mr. Swan's answer thereto:

"*Q.* You heard Mr. Schultz say you said, 'This is your car and you can take it away.' Did you ever make that statement?

"*A.* If I did, I don't ever remember it, so help me."

On redirect examination, following the above testimony, Mr. Swan testified:

"*Q.* You say you told him you didn't have any plates to put on the car?

"*A.* I can't be absolutely sure we didn't have any plates. I do know we did have plates in stock. We had probably at that time 5 or 6 dealer plates. I do remember distinctly telling him I would not put a dealer plate on the car.

"*Q.* And you do recall telling him he couldn't take the car without plates?

"*A.* I told him I would not be responsible for putting a set of dealer plates on the automobile.

"*Q.* When you said that, when you told him he couldn't take the car out without plates, did he do anything about wanting to get his money back or anything?

"*A.* As I recall the incident, Harvey (Schultz) made a remark if he couldn't take it home with him and wouldn't put plates on the car, he would like his $11 back.

"*Q.* What did you do when he made the remark?

"*A.* I went down to the office and talked to Walt and Walt said, 'Give him the $11 back.'

"*Q.* Did you offer it back to him?

"*A.* Yes.

"*Mr. Glassen* (attorney for plaintiff): I move to strike what Walt said.

"*The Court:* Yes, you may strike that.

"*Q.* When he asked for his money back, did you go in and talk with Mr. Neal?

"*A.* As I remember it, yes.

"*Q.* Did you have a conversation with Mr. Neal about this request?

"*A.* Yes.

"*Q*. Did you come out and talk with Mr. Schultz then?

"*A*. As I remember it, I came out with $11 and offered it.

"*Q*. Offered him the $11 back?

"*A*. Yes.

"*Q*. What did he say?

"*A*. Well, he decided he didn't want it back; he wanted the automobile.

"*Q*. At that time did he say he was going down and talk with McDougall (police chief)?

"*A*. It could have been at that time or could have been shortly afterwards. There was a little argument. I was going to—I was getting a little bit hot under the collar about all the time it was taking up. There was a little talk about the dealer's plates and Harvey left the lot. Before he left he made a remark he was going down and see if he could get permission from McDougall, to drive the car home.

"*Q*. Did you tell him if he got permission from McDougall he could drive the car out of the lot without plates on?

"*A*. If I told him I would have been perfectly safe because McDougall would not give him permission.

"*Q*. Did you tell him?

"*A*. I just don't recall.

"*Mr. O'Brien* (defendant Neal's attorney): That is all.

"*Mr. Glassen*: You might have told him if McDougall gave him permission that was okay.

"*The Witness*: I might have told him.

"*Mr. Glassen*: You might have told him you didn't have any plates?

"*The Witness*: That is very true.

"*Mr. Glassen*: That is all.

"*Mr. O'Brien*: If you might have told him, it was because you knew McDougall would not give such permission?

"*The Witness*: That is correct.

"*Mr. Glassen*: You were assuming what McDougall was going to tell him?

*"The Witness:* That is about it.

*"Mr. Glassen:* Nothing further."

Chief of Police, Darwin McDougall, testified: "I told him (Schultz) I could not give him authority to drive off the lot"; "I advised him not to take the car off the lot unless it had license plates upon it"; and Schultz answered, " 'That is what they told me.' "

Schultz testified in regard to his conversation with McDougall:

*"Q.* Didn't you say, 'that is just what they told me' to Mr. McDougall?

*"A.* What do you mean?

*"Q.* When you discussed with him the permission to take the car from the lot?

*"A.* McDougall, no.

*"Q.* When he said you couldn't drive it without plates on it, didn't you say, 'that is just what they told me.'?

*"A.* No.

*"Q.* You didn't say that. You knew you were violating the law when you took that car off the lot without plates?

*"A.* Without plates, yes."

The excluded testimony of 2 witnesses was taken on a separate record, namely the testimony of Mr. Baldwin and Mr. Colestock. Lynn F. Baldwin, a man 59 years of age, a resident of Eaton Rapids since 1920, a certified public accountant, a justice of the peace since 1933, and a member of the Water Resources Commission since 1951, testified as follows:

*"Q.* How long have you known him (Harvey Schultz)?

*"A.* About 25 years—I can't say exactly.

*"Q.* Are you acquainted with the reputation of Harvey Schultz for truth and veracity in the community in which he lives?

*"A.* I think so.

"*Q.* Is it good or bad?
"*A.* It is bad."

The witness Arthur Colestock, age 56, living in Eaton Rapids all his life, with a record of 9 years on the police force and prior thereto an employee of the city and county, and who knew Schultz for 45 to 47 years, testified:

"*Q.* Do you know his reputation in the city of Eaton Rapids for truth and veracity?
"*A.* Yes.
"*Q.* What is it, good or bad?
"*A.* His reputation, I consider, was not good."

The fact that there was testimony which would impeach Schultz's testimony and, further, that Schultz admitted that he had repeatedly been found guilty of drunk and disorderly conduct and had, also, been found guilty of simple larceny, did not excuse the denial of testimony in regard to Schultz's reputation for truth and veracity in the community in which he lived.

It was prejudicial error to exclude this testimony because as was said in *Neal* v. *Neal, supra,* 129, that had such "testimony been admitted, it might have led to a different result."

We agree with Justice SOURIS that "we cannot say from what is before us that the regrettable reference to insurance by plaintiff's counsel was deliberately made," but disagree with his conclusion that "this reference did not constitute prejudicial error," or that "the trial judge was in a much better position than we are" to determine what effect such a reference might have had on the jury.

Nor can we agree with appellee's statement that:

"The word 'insurance' was mentioned a single time during the course of a 5-day trial and this unfortunate incident occurred during the first few

minutes of the testimony during the first day of the trial. There was no repetition or recurrence. * * *

"We submit that it is doubtful that the jury recollected the incident referred to by counsel under this heading but that if it did the matter was clearly cured by the court's instruction on the matter which reads in part as follows:

"'As a matter of fact the question of insurance of any kind shall not be considered in your deliberations.'"

Both counsel complain about the conduct of the other in what the record discloses was a vigorous trial by able and veteran practitioners. Appellant states:

"The picture has been effectively painted; a wealthy corporate defendant; a poor irresponsible codefendant; a patriotic but seriously injured and financially impoverished plaintiff, with a wife and children; a 'defense insurance company' whose counsel engaged in questionable legal practices—all designed to enlist the sympathy and inflame the prejudice of the triers of the fact. Plaintiff's attorney effectively identified the pocketbook out of which a judgment might well be paid."

Appellee counters:

"Appellant's complaint about plaintiff's counsel identifying his client as a father, husband and a veteran of World War II is rather unique. Never before have we heard complaint of such identification of a litigant. We thought the jury had the right to know and would be interested in whether or not the plaintiff was married, had children, and we think counsel is unduly sensitive about the mention of the fact that the plaintiff had served his country as a soldier in World War II.

"By the same token we contend that the identification of Walt Neal, Inc., as a corporation was routine and that the nature of the operation of the corporation was a relevant fact since its manner of opera-

tions would be important on the issue of consent involved.

"Counsel complains because Mr. Neal's tan was mentioned. It could be pointed out that the character assassination of Harvey Schultz indulged in by defendant Neal's counsel was not complained of by the plaintiff. Perhaps plaintiff's service to his country and Walt Neal's tan were not of great probative value but were certainly equal with counsel's identification of witness McDougall as being Irish, a father, a grandfather and married. Not to mention the attempt to show the witness had arrested Schultz.

"Counsel's contention of identifying Walt Neal, Inc., as a big corporation and his collateral complaint about mention of defendant insurance company are incompatible. Ordinarily it is claimed that the matter of insurance is injected into a case by the plaintiff in order to show that a poor defendant can pay the judgment."

The court, in his opinion denying the motion for new trial, referred to the size of the verdict as proof that the jury was not influenced by the matter of insurance, stating:

"The verdict of the jury in this cause was $23,500. The medical proofs indicated that the plaintiff received severe and permanent injuries. The verdict was well within the range of the proofs. This court does not feel that anything occurred in the course of the trial, as relates to the matter of insurance, to create prejudice or bias 'on the part of the jury, nor that the mention of the word insurance entered into the determination as to the amount of the verdict."

Answering this contention, appellant states:

"It has become commonplace in this type of case for the court to acknowledge the error but to say that it has reviewed the evidence and that in the light of the seriousness of the injury, the verdict is not excessive and therefore no prejudice resulted. Such

was the conclusion of the trial judge in this instance. But, this avoids the real issue—the question of liability ·itself. No·claim is made that the verdict is excessive but we do claim that defendant has not had a fair trial because of the injection of an irrelevant and prohibited reference to insurance by counsel himself, and that this knowledge influenced the jury in bringing a verdict against the defendant Walt Neal, Inc., on insufficient evidence. How do we know this? By the statute itself, which is expressive of the public policy of this State. This was the very evil sought to be prevented. Can it be said in view of the close question of liability as to permission and gross negligence; the presence of 2 lawyers for 'the defense insurance company'; the absence of a lawyer for the poverty stricken codefendant Schultz, that the jury were not influenced by counsel's remarks? This fact alone could easily have tipped the scales on the question of liability."

In *Lieberthal* v. *Glens Falls Indemnity Company,* 316 Mich 37, 41, 42, we stated:

"The public policy sought to be sustained in this State by the statute and judicial decisions is that a plaintiff shall not be permitted to inject into his suit the element of insurance and thereby obtain an excessive and unjust verdict."

The injection of the issue of insurance, plus the denial of testimony as to Schultz's reputation of truth and veracity, constituted prejudicial error and calls for a reversal of the judgment and a remand for new trial.

The judgment should be reversed and the case remanded. Costs to appellant Neal, Inc.

Carr, C. J., and Dethmers and Adams, JJ., concurred with Kelly, J.